**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LAM RESEARCH CORPORATION,** | § | |
| | § | **Civil Case Number:** 3:23-cv-00859 |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION** |
| | § | |
| **ROBERT CROSS AND** | § | |
| **JTM TECHNOLOGIES, INC.** | § | **COMPLAINT** |
| | § | |
| *Defendants.* | § | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Lam Research Corporation ("Lam" or the "Company") presents this Complaint against Defendants Robert Cross ("Cross") and JTM Technologies, Inc. ("JTM") (collectively the "Defendants") and alleges as follows:

## I.        INTRODUCTION

This is an action for immediate injunctive relief and damages due to the Defendants' misappropriation of Lam's trade secrets, Cross's breach of his Confidentiality Agreement with Lam, and other unlawful activity by the Defendants.  It arises from the Defendants' collective scheme to pilfer Lam's confidential information, trade secrets, and employees and use the illegally obtained information to compete directly with Lam.

Lam designs, develops, and builds wafer fabrication equipment and related services for the semiconductor manufacturing industry.  The Company's equipment includes materials for thin film deposition, plasma etch, photoresist strip, and wafer cleaning processes.  Lam also services and refurbishes this equipment in the aftermarket.

JTM is one of Lam's direct competitors.  JTM specializes in providing repair and refurbishment services on capital equipment and its sub-assemblies for the semiconductor

industry, including Lam's capital equipment.  In fact, the only pieces of equipment currently listed for sale on JTM's website are all refurbished Lam products.  Lam also sells and provides repair and refurbishment services on the very same equipment.

Cross worked at Lam for over nine years until he resigned effective June 15, 2022.  At the time he resigned, he was working as a Field Service Engineer, where his primary job was to install Lam equipment at customer sites.  During his time at Lam, Cross received years of training and had access to a wide array of Lam's most sensitive confidential information and trade secrets, including technical schematics, part descriptions, part lists, pricing information, software, trouble-shooting documents, and training materials.  He also entered into a written agreement with Lam he promised to "hold in the strictest confidence" and "not to use … or disclose to any person, firm or corporation" any of Lam's Confidential Information.

Despite his contractual and statutory obligations, Cross colluded with JTM and emailed JTM highly sensitive and proprietary Lam documents containing Lam's confidential information and trade secrets.  After leaving Lam, he also transferred thousands of files containing Lam's trade secrets and confidential information from his hard drive on his laptop to a USB drive.  There simply is no legitimate business reason for the transfer of all of this information to JTM.  The only logical explanation for such a massive data dump is that Cross and his new employer, JTM, plan to use, and are using, Lam's confidential information and trade secrets.  In doing so, they are illegally leveraging Lam's property to more efficiently reverse engineer the Lam processes and equipment that JTM sells, services, and refurbishes.

## II.    THE PARTIES

1.    Plaintiff Lam Research Corporation is a Delaware corporation with its principal place of business in California.

2.      Lam is registered to do business in Texas and regularly sells and services equipment within the state.

3.      Defendant Cross is an adult individual who, upon information and belief, resides in Garland, Texas.   Cross was a Field Service Engineer at Lam until June 15, 2022, when he voluntarily resigned and went to work for JTM.

4.      Defendant JTM is a Texas corporation, with its principal place of business in Texas.

### III.      JURISDICTION AND VENUE

5.      This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § § 1836 et. Seq. ("DTSA"). *See* 28 U.S.C. § 1331. This court has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Count I.  *See* 28 U.S.C. § 1367.

6.      This Court also has federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and complete diversity of citizenship exists between Plaintiff and Defendants.

7.      Under 28 U.S.C. § 1391(b)(1), venue is proper in the Northern District of Texas because Cross resides in the Northern District of Texas.  Venue is also proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.  *See also* 28 U.S.C. § 1391(b)(3).

8.      Defendant Cross is subject to personal jurisdiction in Texas because he resides and works in Texas, maintains continuous contacts in Texas, engaged in suit-related conduct in Texas, and otherwise purposely avails himself of Texas.

9.      Defendant JTM is subject to personal jurisdiction in Texas given its incorporation in Texas, maintenance of a principal place of business in Texas, and engaged in suit-related conduct in Texas.

## IV.      FACTUAL ALLEGATIONS

### A.      Cross's Employment with Lam

10.     Cross started working for Lam as a Consultant on October 21, 2012.  (**Exhibit 1,** Declaration of Allison Filley (hereinafter "Filley Decl.") ¶ 4.)  He was promoted to Field Service Engineer on or around April 15, 2013 and held that role for the remainder of his tenure at the Company.  (*Id.*)

11.     As a Field Service Engineer, Cross was a highly trusted employee.  (**Exhibit 2,** Declaration of Julius Alexander (hereinafter "Alexander Decl.") ¶ 4.)  He installed Lam equipment following customer purchases.  (*Id.*)  He was particularly focused on Lam's plasma etch product line.  Plasma etch is the process of selectively removing materials from a wafer to create the semi-conductor device's features and patterns.  (*Id.*)  The equipment helps chip manufacturers carve small parts such as those needed for the latest multiple patterning sequences, transistors, and advanced memory structures.  (*Id.*)  Each installation generally takes between five to eight weeks.  (*Id.*)  In his role, Cross had access to, a whole host of Lam's Confidential Information including, among other things, technical schematics, part descriptions, part lists, pricing information, software, trouble-shooting documents, and training materials.  (*Id.*)

### B.      Lam's Efforts to Safeguard its Confidential Information and Trade Secrets

12.     Lam has implemented significant controls to safeguard and secure its proprietary, confidential information and trade secrets.  (**Exhibit 3,** Declaration of Erin Zwinger (hereinafter "Zwinger Decl.") ¶ 4.)  For example, Lam installs software called Microsoft Defender on each

company-owned device.  (*Id.*)  Among other things, this software logs instances of an employee

downloading a file from the device onto a portable storage device, such as a USB drive.  (*Id.*)

13.     Microsoft Defender was installed on Cross's laptop before he resigned from the

Company.  (*Id.* ¶ 6.)

14.     Lam bolstered its efforts to protect its confidential information on October 31,

2022, when it implemented a process where the Company's Information Security Team began

conducting daily reviews of all USB activity that was logged through the Microsoft Defender

software (*Id.* ¶ 6.)

15.     Lam also requires its employees to sign confidentiality agreements designed to

protect Lam's confidential information, trade secrets, and other company assets.  (Filley Decl. ¶

7.)

16.     On April 13, 2013, right around the time he was promoted to Field Service

Engineer, Cross signed Lam's Employment, Confidential Information, Conflicts of Interest, and

Invention Assignment Agreements (the "Confidentiality Agreement").  (Filley Decl. ¶¶ 4-7.)

17.     The Confidentiality Agreement was supported by consideration because, among

other things, agreeing to its terms was a condition of Cross's employment.  (Filley Decl. ¶ 7.)

Moreover, Lam in fact provided Cross with confidential and proprietary information in exchange

for his acceptance of the terms of the Agreement.  (Alexander Decl. ¶ 4.)

18.     The Confidentiality Agreement required Cross to hold Lam confidential

information in the "strictest confidence" and "not to use, except for the benefit of Lam, or to

disclose to any person, firm or corporation without written authorization from the Board of

Directors of Lam, any Confidential Information relating to Lam."  (Filley Decl. ¶ 7, Ex. D.)

Specifically, pursuant to the Confidentiality Agreement, Cross agreed as follows:

> I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit or Lam, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of Lam, any Confidential Information relating to Lam.  I understated that "Confidential Information" means any Lam non-public Information, technical data, trade secrets [or] know-how (including, but not limited to, information related to research, product plans, products, services, markets, customer lists and customers including, but not limited to customers of Lam on whom I called or with whom I became acquainted during the term of my employment), marketing plans, software, developments, inventions, process, formulas, technology, designs, drawings, engineering, hardware and software configuration information, code listing, flow charts, personnel information (including titles, responsibilities and compensation), finances or other business information which I receive [or] discover during the course of my employment at Lam, either directly or indirectly in writing, orally, visually, electronically or otherwise.  I understa[nd] that Confidential Information does not include any of the foregoing item[s] which have become publicly known and made generally available to the public through no wrongful act of mine or of other who were under confidentiality obligations as to the item or item involved.

(*Id.*)

19.     By signing the Confidentiality Agreement, Cross also agreed that during the entirety of his employment with Lam, he would "not engage in any other employment, occupation, consulting, or other business activity directly related to" Lam's business and that he would not "engage in any other activities that conflict with [his] obligations to Lam." (*Id.*)

20.     Moreover, pursuant to Paragraph 5 of the Confidentiality Agreement, Cross agreed to return any of Lam's devices, information, and documents upon the termination of his employment:

> I agree that, at the time of leaving the employ of Lam, I will deliver to Lam (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with Lam, otherwise belonging

> to Lam, its successors or assigns, or otherwise coming into my
> possession during the course of my employment with Lam. In the
> event of termination of my employment, I agree to sign and deliver
> the "Termination Certification" attached here to as **Exhibit C**.

(*Id.*)

21.     The Confidentiality Agreement also required Cross to "diligently adhere to Lam's

Global Standards of Business Conduct" and "other Lam policies related to [his] employment with

Lam." (*Id.*)

22.     Lam's Global Standards of Business Conduct describes Lam's intellectual property

rights as Lam's "most valuable assets." (Filley Decl. ¶ 5, Ex. A.) The policy states each employee

at Lam "has a duty to protect these assets from unauthorized disclosure." (*Id.*) The policy further

explains that "[b]efore sharing any confidential information with an outside party, in writing or

orally" the employee must "make sure an appropriate Non-Disclosure Agreement (NDA),

approved by Legal, has been executed." (*Id.*)

23.     Cross's Confidentiality agreement also prohibits him from directly or indirectly

soliciting, inducing, recruiting, or encouraging any of Lam's employees to leave their employment

with Lam. (Filley Decl. Ex. D.)

24.     Finally, Cross's Confidentiality Agreement specifically states that, in the event of

a breach or threatened breach, "Lam may seek and obtain, in addition to any other right or remedy

available, an injunction from a court of competent jurisdiction restraining such breach or

threatened breach and, if appropriate, an order of specific performance of any such provision of

this Agreement." (*Id.*) The Confidentiality Agreement further provides that "no bond or other

security shall be required in obtaining such equitable relief." (*Id.*)

25.     In addition to protecting its confidential information and trade secrets by requiring

its employees, including Cross, to sign Confidentiality Agreements, Lam also required Cross, and

all of its employees, to complete training on the importance of securing and protecting Lam's confidential information.  (Filley Decl. ¶ 6.)  For example, Lam's Global Standards of Business Conduct online training specifically addressed information assets, including product research, designs, pricing information, and other intellectual property (including trade secrets) and stated: "If you leave our organization, you may not share confidential information with your new employer or anyone else."  (Filley Decl. ¶ 6, Ex. B.)  Likewise, another Lam training explained to employees that "[t]he information that we, as a company, create, use, and store is among our most important and valuable assets."  (Filley Decl. ¶ 6, Ex. C.)  The training also explained that employees "are responsible for protecting the company's confidential information [they] work with by ensuring it is not disclosed, either deliberately or accidentally."  (Filley Decl. Ex. C.)

C.      **Cross's Resignation**

26.      On May 27, 2023, Cross sent an email to his supervisor, Julius Alexander ("Alexander"), notifying him that he would be resigning his employment and providing two weeks' notice.  (Alexander Decl. ¶ 5.)  Alexander immediately called Cross to ask him, point blank, whether Cross was resigning to go work at a competitor.  (*Id.*)  Cross told him "No," but did not disclose the name of his new employer.  (*Id.*)   He merely said that he had an amazing opportunity that would allow him to avoid the work-related travel he was regularly engaging in at Lam and remain in the Dallas area.  (*Id.*)

27.      Whether a departing Lam employee is going to work at a competitor is a critical piece of information.  (Alexander Decl. ¶ 6.)  Lam follows different termination procedures depending on where such an employee is going to work after leaving Lam.  (*Id.*)  For individuals who are leaving Lam and going to work at a competitor, the Company immediately cuts off their access to Lam systems and proceeds to collect their laptop, phone, and any company equipment in the employees' possession.  (*Id.* at ¶ 7.)  The Company also relieves such employees of their duties,

although it still pays them for two weeks, assuming the employee gave two weeks' notice like Cross did.  (*Id.*)  In sum, the Company acts quickly to help ensure that its confidential and proprietary information does not fall into the hands of its competitors.  (*Id.*)

28.     This is the exact procedure that would have applied to Cross had Cross been truthful about the identity of his new employer.  (Alexander Decl. ¶ 8.)  But he was not.  JTM is a competitor of Lam, and that is where Cross was going to work.  (*Id.* at ¶ 9.)  Because Cross failed to tell the truth when asked, Lam allowed Cross to continue to work for Lam the remaining two weeks instead of immediately cutting off his access and collecting his laptop and other company property in his possession.  (*Id.* at ¶¶ 7-8.)

29.     Cross's last day at Lam was June 15, 2022.  (Alexander Decl. ¶ 3.)

30.     Following his separation, Lam disconnected Cross's network access.  (Filley Decl. ¶ 8.)  The Company also mailed him a box with a prepaid return shipping label so that Cross could return his laptop and other Lam devices and documents.  (Filley Decl. ¶ 9.)

31.     Despite his contractual obligations to return Lam's property and Lam's request for him to do so, Cross has yet to return his Lam-issued laptop or any other devices.  (Filley Decl. ¶ 9.)

**D.     Cross Transfers Thousands of Lam Files from his Laptop to a USB Drive**

32.     As discussed, on or around October 31, 2022, Lam implemented a process pursuant to which the Company's Information Security Team conducts daily reviews of all USB activity that was logged through the Microsoft Defender software to determine whether such activity is consistent with each user's job duties.  (Zwinger Decl. ¶ 6.)

33.     On March 24, 2023, a member of Lam's Information Security Team observed that Cross had transferred over 800 files from his Lam-issued laptop (which, again, he should have returned upon his departure from the Company but still has not) to a USB drive on the evening of

March 23, 2023.  (Zwinger Decl. ¶ 7.)  Upon further review, Lam determined that many of these documents were confidential and contained highly sensitive information and trade secrets.  (*Id.*)

34.     After discovering Cross's USB activity from March 23, 2023, Lam investigated Cross's prior USB activity.  (Zwinger Decl. ¶¶ 8-9.)

35.     This investigation identified that Cross transferred approximately 3,400 confidential Lam files to a USB between June 17 and June 23, 2022 and two more files on October 15, 2022.  (Zwinger Decl. ¶ 10.)  These USB transfers were captured in the Microsoft Defender software; however, Lam was unaware of the activity at the time it occurred because the Company had not yet implemented its daily review process designed to catch such anomalies.  (*Id.*)

36.     The reports generated by the Microsoft Defender software identify the file name of each file downloaded onto the USB drive.  (Zwinger Decl. ¶ 10.)  Lam uses a unique file naming convention that allows the Company to quickly identify the type of information contained within its confidential product specification files.  (*Id.*)  Within those confidential documents, file names that begin with 713, 714, and 715 prefixes are highly sensitive because they contain the blueprints that would permit recreating and building Lam's equipment parts.  (*Id.*)  During the investigation, Lam confirmed that many of the files Cross downloaded onto a USB contained documents that began with the 713, 714, and 715 prefixes and, therefore, contained Lam's most sensitive information.  Lam also identified various other documents with the file naming convention used for confidential product specification files, confirming that Cross downloaded a broad range of such files to the USB drive.  Such information includes technical product specifications, detailed schematics, pricing information on parts, internal presentations, and equipment configurations. (*Id.*)

**E.     Lam Discovers Cross is Actually Working for One of Its Competitors, JTM**

37.     During the course of the investigation, Lam learned for the first time that, contrary to what Cross represented as he was leaving Lam, Cross actually went to work for one of its competitors, JTM. (Alexander Decl. ¶ 9.)

38.     JTM provides on-site technical support services and repairs for capital equipment in the semiconductor industry.  (Alexander Decl. ¶ 10.)  Additionally, JTM refurbishes, installs, and sells capital equipment tools in the semiconductor industry. (*Id.*)

39.     JTM's website specifically advertises that it refurbishes and re-sells Lam capital equipment.  (Alexander Decl. ¶ 10.) As of today, JTM's website lists multiple refurbished Lam products for sale.  (*Id.*)

40.     On March 28, 2023, Lam called JTM's president, James Joyce, ("Joyce") to discuss Cross's USB activity and to ask whether JTM was using Lam's confidential information.

41.     The next day, Lam, through its counsel, sent Cross a letter, copying JTM, stating that Cross must immediately cease and desist violating his obligations to Lam as set forth in his signed Confidentiality Agreement, Lam's Global Standards of Business Conduct, and pursuant to federal and state law. (**Exhibit 6.**)  The letter informed Cross that Lam was aware he had not returned his laptop and that he was continuing to use the device to download "highly confidential Lam documents without Lam's consent."  (*Id.*)  The letter went on to state that "Lam has conclusive evidence that [he] downloaded over eight hundred Lam files from [his] computer to a USB drive on March 23, 2023."  (*Id.*)

42.     On March 31, 2023, Cross responded to Lam's letter and flatly denied downloading any Lam files onto a USB despite the concrete evidence demonstrating otherwise.  Cross also indicated he did not know the location of his Lam equipment, including his laptop, because it "may

have been something that was thrown out back" when he moved in with his girlfriend. (**Exhibit 7**.)

### F.     Lam Discovers That Cross Sent JTM Confidential Information While He Was Still Working for Lam

43.     Lam continued its investigation and discovered on April 5, 2023 that, during his employment, Cross brazenly violated his Confidentiality Agreement and other obligations he owed to Lam by exchanging several emails containing Lam's confidential information and trade secrets with JTM's President, James Joyce, who is also a former Lam employee, and another JTM employee, Lowell Dodge.  (**Exhibit 4,** Declaration of Nolan Robinson (hereinafter "Robinson Decl.") ¶ 4.)  Cross used his Lam-issued email address to correspond with Joyce.  (*Id.*)

44.     For example, on June 3, 2022, after giving notice of his resignation to Lam, Cross sent an email to Joyce with a detailed Lam schematics file attached.  (Robinson Decl. ¶ 5.)  Lam's schematics are highly sensitive documents.  (*Id.*)  Indeed, the introduction of the document that Cross attached to the email states in bold and all caps: "**THIS DOCUMENT CONTAINS PROPRIETARY INFORMATION OF LAM RESEARCH CORPORATION AND SHALL NOT BE REPRODUCED. THE INFORMATION CONTAINED HEREIN SHALL NOT BE DISCLOSED TO PERSONS EXCEPT THOSE NECESSARY TO PRODUCE THE PART OR PRODUCT OR USE THE PROCESS HEREIN SPECIFIED FOR LRC. ANY EXCEPTION TO THE FOREGOING CONDITIONS MUST BE APPROVED BY ADVANCED WRITTEN AGREEMENT SIGNED BY AN AUTHORIZED REPRESENTATIVE OF LRC.**" (*Id.*)

45.     On June 14, 2022, one day before his separation date, Cross sent an email to Joyce with a list of O-rings used in Lam chambers and identified the specific product name, product location, and the quantity used. (Robinson Decl. ¶ 6.)

46.     Cross was even emailing individuals at JTM highly sensitive, proprietary Lam information and trade secrets to individuals at JTM before he announced his resignation.

47.     On February 3, 2022, for example, Cross sent an email to Joyce that contained pricing information for robotics parts that Lam purchases from a vendor named Brooks Automation. (Robinson Decl. ¶ 7.)

48.     On November 19, 2019, Cross sent an email to Lowell Dodge containing a confidential Lam presentation with details on installation keys. (Robinson Decl. ¶ 9.)   The document Cross attached was labeled "Lam Research Confidential." (*Id.*)

49.      And it wasn't just Cross sending this information to JTM.  On December 14, 2021, Joyce sent Cross a detailed Lam 2300 configuration and sought Cross's input.  (Robinson Decl. ¶ 8.)  Joyce and Cross exchanged several additional emails on the same date where Cross provided information on the proper part to use in the piece of equipment.  (*Id.*)

50.     On April 13, 2023, Lam, through its counsel, sent a letter to JTM stating that JTM must immediately cease and desist using any of Lam's confidential information and trade secrets and asking for confirmation that JTM will cooperate with Lam in the return and purging of Lam's confidential information from JTM systems.  (**Exhibit 8**.) As of the date of this filing, JTM has not responded.

**G.     Cross Solicits Lam Employees for JTM**

51.     As Lam continued its investigation into Cross, the Company learned that Cross and JTM's efforts did not stop at misappropriating Lam's confidential information and trade secrets.  (*See* Robinson Decl. ¶ 10.)  Rather, they worked together to recruit other Lam employees—both before and after Cross left Lam—in clear violation of Cross's contractual and JTM's common law and statutory obligations to Lam.  (*Id.*)

52.     On May 18, 2022, Joyce sent Lam's employee Buzz Messier ("Messier") an email with the subject line "JTM Info" that begins with "Hello Buzz, Here's the info I believe Robert discussed with you." (Robinson Decl. ¶ 11, Ex. A.)  Later that same day, Joyce sent Messier another email stating "Robert speaks highly of you." (*Id.* at ¶ 11, Ex. B.)

53.     On May 22, 2022, Cross sent an email to Joyce copying another Lam employee, Manuel Garcia.  The subject line of the email reads: "manny's email". (Robinson Decl. ¶ 12, Ex. C.)

54.     On June 27, 2022, Messier sent Joyce an email indicating he was ready to leave Lam and sign JTM's offer letter, provided they agreed to one stipulation.  (Robinson Decl. ¶ 13, Ex. D.)  Specifically, he wrote: "I have one stipulation, as I'm sure Robert explained to you, I have 200 hours of Vacation on the books and need to burn it or I lose it." (*Id.*)

55.     On June 28, 2022, Joyce sent an email to Cross, Messier, and a Lam contractor named Pablo Arroyo asking them to fill out travel profiles for JTM. (Robinson Decl. ¶ 14, Ex. E.)

**H.      Risk of Loss to Lam**

56.     Lam's confidential information and trade secrets are some of Lam's most valuable assets.  (**Exhibit 5,** Declaration of Ronald Linnebur (hereinafter "Linnebur Decl.") ¶ 5.)  Lam has spent many years and billions of dollars to generate designs for the equipment it sells.  (*Id.*)  In 2022 alone, Lam spent over one billion dollars on research and development (*Id.*).

57.     Lam has used—and will continue to use—its confidential information in the refurbishment and repair segment of the semiconductor industry.  (Linnebur Decl. ¶ 5.)  Because this information is confidential, Lam's competitors do not know and do not have access to such information, which provides Lam with a competitive advantage.  (*Id.*)

58.     If one of Lam's competitors, such as JTM, were to access the information Cross emailed to JTM and/or downloaded onto a USB drive, the competitor could use that information to replicate Lam's products and would be able to design, develop, manufacture, refurbish, and repair Lam equipment while avoiding the expense and time that it takes to legally reverse engineer the products.  (Linnebur Decl. ¶ 8.)  For example, the technical schematics Cross downloaded could be used by JTM or other competitors to produce replacement parts for the Lam equipment it refurbishes while avoiding the cost of properly licensing that intellectual property from Lam. (*Id.*)  Likewise, JTM and other competitors could use the trouble-shooting documents Cross downloaded to service Lam equipment that they would be otherwise unable to service and repair. (*Id.*)  Thus, Lam would be irreparably harmed if any of its competitors were to access the information Cross emailed to JTM and/or downloaded onto a USB drive because it would cause Lam to lose its competitive advantage. (*Id.*)

## COUNT I
### VIOLATIONS OF THE FEDERAL DEFEND TRADE SECRETS ACT (DTSA)
### (Against All Defendants)

59.     All the foregoing allegations are incorporated herein by reference for all purposes.

60.     The actions of Cross and JTM, as described above, constitute violations of one or more provisions of the DTSA.

61.     The DTSA applies because Lam's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, which are provided to customers across the United States.

62.     By engaging in the above conduct, Cross and JTM have misappropriated, threaten to misappropriate, or inevitably will misappropriate Lam's trade secrets related to products used in, or intended for use in, interstate or foreign commerce.

63.    In particular, the Lam information described above, including the technical schematics, part descriptions, part lists, pricing information, software, trouble-shooting documents, and training materials, obtained by Cross by virtue of his employment with Lam, are trade secrets. Lam expended substantial time, energy, money, and ingenuity in collecting and compiling this information. Lam invests significant time, effort, and financial resources in developing and maintaining its product lines.

64.    Lam has taken reasonable measures to keep the trade secret information secret by, among other things: (1) requiring employees to sign confidentiality agreements; (2) promulgating confidentiality and information security policies, and training employees on confidentiality; (3) restricting network access to employees; and/or (4) installing software that monitors the use and disclosure of Lam's information.

65.    Lam's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use, such as Lam's competitors. A competitor with access to Lam's aforementioned trade secrets could use that information to replicate Lam's products and services, just as JTM has done here. Indeed, Lam derives significant economic value from maintaining the secrecy of its product related information, as such information is necessary to design, develop, manufacture, refurbish, and repair Lam's equipment.

66.    Without authorization, Cross misappropriated, threatens to misappropriate, or inevitably will misappropriate Lam's trade secrets in a willful manner and with a deliberate intent to injure Lam and improve JTM for his own financial gain by, among other things: (1) emailing Lam trade secrets to a direct competitor (JTM); (2) failing to return Lam's devices and confidential

information after resigning from employment; (3) downloading thousands of documents containing Lam's confidential information and trade secrets onto a USB drive after separating from the Company; and (4) using and  disclosing, or threatening to use or disclose, or inevitably using or disclosing, without Lam's consent, Lam's confidential and trade secret information.

67.     Without authorization, JTM misappropriated, threatens to misappropriate, or inevitably will misappropriate Lam's trade secrets in a willful manner and with a deliberate intent to injure Lam and improve JTM for its own financial gain by, among other things, acquiring, receiving, or possessing, or inevitably acquiring, receiving, or possessing Lam's trade secrets, knowing same to have been misappropriated without Lam's authorization, and using same to design, develop, manufacture, refurbish, and/or repair Lam equipment.

68.     Cross owed a duty to Lam to maintain the secrecy of the trade secrets and to limit the use of the trade secrets. Lam communicated the trade secrets to Cross in confidence. At the time of disclosure, Cross knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

69.     Cross and JTM acquired the trade secrets by improper means and/or disclosed and utilized the trade secrets, or inevitably will disclose and utilize the trade secrets, without Lam's consent, to perform competitive services.

70.     Joyce, the individual that received emails containing Lam's confidential information and trade secrets from Cross, is an agent of JTM.

71.     Defendants can obtain economic value from the disclosure and use of Lam's trade secrets by avoiding the years, and billions of dollars in investment, that it took Lam to develop the trade secrets. For example, JTM could use the technical schematics to produce replacement parts for the Lam equipment it refurbishes while avoiding the cost of properly licensing that intellectual

property from Lam. Likewise, JTM could use the trouble-shooting documents to service Lam equipment that it would be otherwise unable to service and repair. There is no limit to the potential uses of the documents and information Cross and JTM have misappropriated from Lam.

72.     As a consequence of the foregoing, Lam has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Unless enjoined, Defendants will continue to use Lam's trade secret information to unfairly compete and Lam will continue to suffer irreparable harm that cannot be remedied solely though monetary damages.

73.     As a direct and proximate result of the conduct of Defendants, Lam is entitled to actual damages in an amount to be determined at trial. The acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## COUNT II
## VIOLATIONS OF THE TEXAS UNIFORM TRADE SECRETS ACT
### (Against All Defendants)

74.     All the foregoing allegations are incorporated herein by reference for all purposes.

75.     Cross was privy to Lam's highly confidential information and trade secrets.  All of this information provides him and JTM with a valuable advantage against competitors in the market.

76.     JTM received Lam's confidential information and trade secrets from Cross while he was still employed by Lam, including after Cross had already accepted a job offer from JTM. It is inevitable that Cross and JTM will use these trade secrets to JTM's advantage and with the express purpose of damaging Lam, or with reckless disregard for the damage to Lam. These actions constitute willful and malicious misappropriation on the part of Cross and JTM.

77.     On at least six separate occasions following his separation from the Company, Cross downloaded thousands of files containing Lam's confidential information and trade secrets onto a USB drive. Upon information and belief, Cross shared these files with JTM.  It is inevitable that Cross and JTM will use these trade secrets to JTM's advantage and with the express purpose of damaging Lam, or with reckless disregard for the damage to Lam. These actions constitute misappropriation on the part of Cross and JTM.

78.     Such conduct by Cross and JTM is unjustified, unexcused, and a violation of the Confidentiality Agreement. This conduct has caused and will continue to cause actual damage to Lam.

79.     The misappropriation of Lam's trade secrets has also caused and will continue to cause Lam imminent and irreparable harm in the form of lost goodwill, competitive advantage, market share, and existing and potential business opportunities unless restrained and enjoined by this Court.

80.     Therefore, in addition to seeking damages that are capable of calculation, attorneys' fees, costs, and exemplary damages, Lam is also seeking injunctive relief for the harm caused by Cross and JTM's misappropriation of trade secrets. *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.003 to 134A.005.

## COUNT III
## BREACH OF CONTRACT
### (Against Cross)

81.     All the foregoing allegations are incorporated herein by reference for all purposes.

82.     Cross signed the Confidentiality Agreement with Lam, in which he agreed he would protect Lam's confidential information, abide by Lam's Global Standards of Business Conduct and other company policies, refrain from engaging in activities that conflicted with his obligations

to Lam, refrain from engaging in other business activity directly related to Lam's business, refrain from soliciting Lam's employees for a period of twelve (12) months after his separation, and return all Company property and information upon his separation from the Company.

83.     The Confidentiality Agreement is a binding and enforceable contract under Texas law.

84.     Cross breached the contract by (1) divulging and using confidential information gained during his employment with Lam; (2) failing to return all of Lam's property and information following his resignation; (3) engaging in conduct that conflicted with his obligations to Lam during his employment; (4) engaging in other business activity directly related to Lam's business, and (5) soliciting Lam employees to work for JTM.

85.     Cross's breach has caused and will continue to cause Lam imminent and irreparable harm in the form of lost goodwill, competitive advantage, market share and existing and potential business opportunities unless restrained and enjoined by this Court.

86.     Therefore, in addition to seeking damages that are capable of calculation, costs, attorneys' fees, and exemplary damages, Lam is also seeking injunctive relief for the harm caused by Cross's breach and an Order requiring specific performance of Cross's obligations under the Confidentiality Agreement. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8).

<u>**COUNT IV**</u>
**TORTIOUS INTERFERENCE WITH THE CONFIDENTIALITY AGREEMENT**
**(Against JTM)**

87.     All the foregoing allegations are incorporated herein by reference for all purposes.

88.     Lam is a party to the Confidentiality Agreement, a valid and enforceable agreement with Cross.

89.     Upon information and belief, JTM was aware of the Confidentiality Agreement from times preceding the breaches thereof.

90.     JTM permitted and/or encouraged the breaches of the Confidentiality Agreement, and intentionally, willfully, and tortiously interfered with the contract with malicious intent, through improper means, and for an improper purpose.

91.     JTM's tortious conduct has caused and will continue to cause Lam imminent and irreparable harm in the form of lost goodwill, competitive advantage, market share, and existing and potential business opportunities unless restrained and enjoined by this Court.

92.     Therefore, in addition to seeking damages that are capable of calculation, costs, and exemplary damages, Lam is also seeking injunctive relief for the harm caused by JTM's tortious conduct.

**COUNT V**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

93.     All the foregoing allegations are incorporated herein by reference for all purposes.

94.     Defendants knowingly and willfully conspired and agreed among themselves to misappropriate Lam's confidential information and trade secrets for the financial benefit of JTM.

95.     Defendants committed the wrongful acts herein alleged pursuant to, and in furtherance of, the conspiracy and the above-alleged agreement.

96.     As a result of Defendants' wrongful acts alleged herein, Lam has suffered damages and will continue to suffer damages in the form of lost goodwill, competitive advantage, market share, and existing and potential business opportunities. Defendants are jointly and severally liable to Lam.

97.     In addition to seeking damages that are capable of calculation, costs, and exemplary damages, Lam is also seeking injunctive relief for the harm caused by Cross and JTM's unlawful conduct.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against JTM)**

98.     All the foregoing allegations are incorporated herein by reference for all purposes.

99.     JTM placed Cross in a position in which he will use knowledge of Lam's sensitive, confidential and proprietary information to JTM's benefit. Additionally, JTM, through its president James Joyce, improperly obtained documents that the company knew contained Lam's sensitive, confidential and proprietary information. In doing so, JTM is seeking to take Lam's market share by capitalizing on Lam's confidential information that Cross and JTM improperly obtained.

100.    JTM would be unjustly enriched if it were allowed to retain the benefits it received through its malicious and tortious conduct by taking undue advantage of Lam.

101.    Therefore, in addition to seeking damages that are capable of calculation, costs, and exemplary damages, Lam is also seeking injunctive relief for the harm caused by JTM's unjust actions.

**COUNT VII**
**CONVERSION**
**(Against Cross)**

102.    All the foregoing allegations are incorporated herein by reference for all purposes.

103.    Lam is the legal owner and possessor of equipment that, upon information and belief, is currently in Cross's possession. Lam is entitled to immediate possession of said property.

104.    Lam seeks return of its property.

## EXEMPLARY DAMAGES

105.    All the foregoing allegations are incorporated herein by reference for all purposes.

106.    Defendants have acted willfully, intentionally, maliciously, and/or with reckless disregard for the rights of Lam. Lam should be awarded exemplary damages for these acts, including under TEX. CIV. PRAC. & REM. CODE § 134A.004.

## ATTORNEYS' FEES

107.    All the foregoing allegations are incorporated herein by reference for all purposes.

108.    Lam is entitled to recover, in addition to costs, its reasonable attorneys' fees under TEX. CIV. PRAC. & REM. CODE  §38.001(8) and § 134A.005 as well as under any other applicable provision at law or equity for which it now sues.

## PRAYER

**WHEREFORE**, Lam respectfully prays for the following relief:

A.    A temporary and preliminary injunction, enjoining and restraining: (a) Cross from violating and of the terms of the Confidentiality Agreement; (b) JTM, and anyone acting in concert with it, from interfering with Cross's Confidentiality Agreement with Lam; (c) Defendants, and anyone acting in concert with Defendants, from utilizing, divulging, disclosing, or misusing any Lam Confidential Information (as defined by the Confidentiality Agreement) and trade secrets; and (d) Cross from performing any work for JTM until after all Lam confidential, proprietary and trade secret information has been returned to Lam and removed from Defendants' possession;

B.    An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Cross and any employee or representative of JTM;

C.      An Order requiring Defendants to submit to a forensic review of their electronically stored information, including any communications, text messages, or emails on personal electronic devices, including any USB device used by Cross to transfer files from his Lam laptop, such as cellular telephones, or stored in email or other cloud storage accounts, to identify and permanently delete any of Lam's Confidential Information and trade secrets.

D.      An Order requiring Cross to return any of Lam's company property currently in his possession, including his laptop.

E.      Upon final trial, judgment against Defendants for full permanent injunctive relief in accord with Paragraph A above and for the full amount of Lam's damages, including, but not limited to, lost profits as found by the trier of fact as a consequence of their conduct;

F.      Exemplary damages against Defendants for their malicious, tortious conduct in an amount consistent with constitutional and statutory principles;

G.      Pre-judgment interest at the maximum lawful rate;

H.      Post-judgment interest at the maximum lawful rate;

I.      Lam's reasonable and necessary attorney's fees in prosecuting its claim(s) through trial and, if necessary, through appeal;

J.      All costs of suit; and

K.      Any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Lam hereby demands a jury trial for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: April 24, 2023

/s/ Brian Jorgensen
Brian M. Jorgensen
Texas State Bar No. 24012930
Enrique Lemus
Texas State Bar No. 24092684
Chelsea A. Till
Texas State Bar No. 24115858
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
(214) 220-3939 – Telephone
(214) 969-5100 – Facsimile
E-mail: bmjorgensen@jonesday.com
Email: ctill@jonesday.com

*Attorneys for Plaintiff*